# Nulton's Appeal.

1. A court of equity will not give relief where the answer of the defendant expressly negatives the material allegations of the bill, and the evidence of only one person, without corroborating circumstances, affirms what has been so negatived.

2. Where a bill in equity prays for the cancellation of a deed on the ground of want of consideration, mistake and ignorance of legal right, it must offer to place the adverse party in statu quo before the execution of the deed.

3. What evidence is not sufficient to authorize a court of equity to set aside a deed on the ground of want of consideration, mistake and ignorance of legal right.

4. Where a married woman did not join with her husband in proceedings for the adoption of a child under the Act of 1855, no confidential relation exists between her and the child so adopted by her husband. In business transactions, they deal at arm's length.

[Nulton's Appeal.]

April 12th 1883.  Before Mercur, C. J., Gordon, Paxson, Trunkey, Sterrett, Green and Clark, JJ.

Appeal from the Court of Common Pleas of *Luzerne county :* Of January Term 1883, No. 354.

This was an appeal by Elvira Nulton, widow of Benjamin Nulton, deceased, from a decree of the said court ordering that a certain deed of Frederick Nulton and wife to Elvira Nulton, be cancelled and set aside on the ground of fraud, mistake and want of consideration.  Said decree was made in conformity with the prayers of a bill in equity, wherein Frederick M. Nulton was complainant, and Elvira Nulton, defendant, and which set forth the following facts:

That complainant was the adopted son and heir of Benjamin Nulton and Elvira Nulton by proceedings under Act of May 4th 1855 ; that Benjamin Nulton died March 26th 1881, intestate and without issue, leaving a widow, the said Elvira Nulton ; that the said Benjamin Nulton died seised in fee of a farm containing 133 acres ; that on April 2d 1881, in pursuance of an agreement of March 29th 1881, stipulating for an equal division of said farm, complainant executed a deed to said Elvira Nulton for 89 acres 71 perches thereof ; that at the time of executing said deed complainant was ignorant of his legal rights in the estate of Benjamin Nulton, deceased ; that said deed was, without consideration, made upon false statements of said Elvira Nulton of the law and facts concerning the value of said estate, and is fraudulent and void.

The bill prayed that a decree be entered ordering said deed to be delivered up and cancelled, and that defendant account to the complainant.

The answer averred that the complainant was fully acquainted with his legal rights ; that the survey of the farm was made and deeds drawn under his direction ; that the money consideration of one dollar therein named was paid ; that no false statements either of law or fact were made to induce complainant to execute his deed ; and that in pursuance of defendant's deed to complainant (for the remaining portion of the farm) he went into possession of his portion, and remained still in possession thereof.

The case was referred to S. J. Strauss, Esq., as Examiner and Master, who took testimony in behalf of the allegations of the bill and answer.  That on behalf of the complainant consisted of his own testimony, that of the surveyor, Cook, who testified to the unequal division of the land hereinafter referred to, and the manner of the survey, the legal evidence of Frederick Nulton's adoption, that of Embleton who was present at the survey and testified that the division was unequal, that of one Perrigo, who " did not consider the complainant of average intelligence,"

and that of the Ferrels, who testified to the taking of $280 from the house of Benjamin Nulton by Paddock and Turner, a circumstance to be noticed hereafter. A few other witnesses were examined as to the complainant's mental capacity, the comparative value of the purparts of the land, and other unimportant features of the case. The complainant testified as follows as to the manner in which his consent to the agreement of March 29th 1881, was obtained :

"As I was coming out of the court-house I met James Turner and George Paddock, and Turner said, We are looking for you. They said they had hired a rig and sent for me, but could not find me. Then they wanted me to go to the Forest house where Elvira Nulton was. I went there and we talked. She said they had not done anything to hurt me but that they had been working in my interest. She made that remark because I had found fault with some things that happened at home. She said she had always thought a good deal of me, and wanted to do well by me. She then wanted me to come to Mr. Shoemaker's office to fix some business which they could not do without me. So we went down to Mr. Shoemaker's office. Mrs. Elvira Nulton, James Turner and George Paddock went with me. L. D. Shoemaker and R. C. Shoemaker were there. Mr. Turner called me outside and said Mrs. Nulton wanted me to have half of the property, and she and George Paddock would take the other half. He said that Mrs. Nulton wanted to divide everything all equal and square. He then said that George Paddock would hold just as much as I would. He said Mr. Nulton had written a letter to George Paddock telling him that if he, Paddock, would come back and help take care of him as long as he lived he would make him, Paddock, an heir along with me, Frederick Nulton, to this property. He said Mr. and Mrs. Nulton had both signed the letter, and that Paddock had the letter there. I asked Turner how that was, and he said it will stand law, because Mr. Shoemaker says so. He said the best thing I could do was to take the half, and then I would not have any taking care of her, or anything of that kind to do. I then asked him if she were going to take the $300 widow right. He said, No she will not, she will divide everything up equally. Then I talked with her, she and I came outside and she said she wanted to divide all up equally and give me one half. I then asked her if I was to have half of all the loose personal property, and of all the money at interest. She said I was to have one half of everything  .  .  . then the contract was drawn. Mr. Shoemaker drew the contract  .  .  . I did not know anything about Mr. Turner, except that he assisted in taking care of Mr. Nulton during his illness, that he lives at Mill Hollow, and works about the mines, and is a sort of a petti-

fogger. I saw Mrs. Nulton pay him $10 for his services. That was the first that I knew that he was in her pay."

The Master reported substantially the following as his finding of facts : Frederick M. Nulton was legally adopted, when about four years old, by Benjamin Nulton in 1856, and from that time till he was of full age he lived in his adopted father's family, except during several short periods. Elvira Nulton did not join in the proceedings for his adoption. Before he was of age the plaintiff received some money from Benjamin Nulton, sometimes as wages and sometimes as spending-money ; at times he worked elsewhere, but the benefit of his labor, until he was twenty-one, was chiefly reaped by Benjamin. At the age of twenty-three the plaintiff married, and for a short time lived in one of the houses on the said farm. During this time he had some partnership farming transactions with Benjamin, in respect to which they disagreed, and he sold out his crops to Benjamin and left. Benjamin died on March 26th 1881, intestate and without issue. The plaintiff and defendant were the only and nearest members of his family who survived him. The day after the funeral the complainant went to Wilkesbarre to ascertain his legal status. He first went into the recorder's office to see whether any land had been conveyed to him by Benjamin Nulton, and then to the prothonotary's office to find " whether he had been adopted or not." Not getting the information he sought, he left the court-house, and was met by J. C. Turner and George Paddock, the former of whom had been retained by the defendant as an adviser, and the latter, who was now nineteen years old, had been living with the Nultons ever since he was three years old. He, however, had never been legally adopted by them. The complainant was told by them that the defendant was at the Forrest House, and wanted to see him. There he met her, and, upon her invitation, he accompanied her to the office of Hon. L. D. Shoemaker to " fix some business which could not be done without him." She told him that she had been working in his interest, and would do better for him than he demanded. While at Shoemaker's office also he was informed that he had been formally and legally adopted by the deceased, but that George Paddock had a letter, signed by both Benjamin and Elvira Nulton, in which they agreed to make him an heir with Frederick, and that, under the circumstances, the plaintiff ought to agree to accept one-half the property for his share of the inheritance, and that he ought to leave the other half to the widow and Paddock. He was told that Paddock's claim under the promise in the letter would " stand law." After more or less negotiation a contract was written and signed by them in which, in consideration of one dollar and other considerations, Elvira Nulton agreed to convey to Fre-

derick M. Nulton all her right, title, etc., in and to the northerly half of the said farm, and Frederick M. Nulton agreed to convey to Elvira Nulton the southerly half of the farm on which the mansion-house was situated.   Deeds to be executed within ten days from the date thereof, or sooner if a proper survey could be made.   Previous to the signing of the contract defendant agreed with the complainant not to claim the widow's $300, but that all the personal property should be equally divided between complainant and herself.   It seems, however, that she subsequently claimed the $300.   According to landmarks agreed upon by the complainant a survey of the farm was made about April 1st 1881, and after running the division-line it was found that there were about eighty-nine acres in the southerly portion, and about fifty-one acres in the northerly portion.   While the division-line was being run the plaintiff found fault constantly, as it was not going to give him half. The deeds, however, were written in accordance with the survey, and on April 2d 1881, both parties went to the office of a justice of the peace.   While there the complainant again objected to the division, and at first refused to sign the deed, but finally both deeds were duly executed.   The money consideration of one dollar was actually paid.   The land thus conveyed to the defendant was much better in quality, and worth, at least, twice as much as that conveyed to the complainant.   The complainant was of undisciplined mind and little education, but able in a general way to take care of himself, and liable to bad bargains like other men.   Evidence was given by witnesses for complainant, that on the night before the funeral, Turner and Paddock had entered the bed-room of the deceased and had taken therefrom some $300 in money, for which they have never accounted.   This evidence, as well as that relating to the widow claiming $300 in the Orphans' Court, the Master, in making up his report, excluded on the ground of irrelevancy, and reported that no confidential relation existed between the parties, and that while the consideration received by the complainant was manifestly and grossly inadequate, yet that the testimony did not warrant him in finding fraud or surprise; that even though the testimony showed sufficient fraud to warrant the decree prayed for, yet the facts were not sufficiently proved according to the demands of the "two-witness" rule, as the testimony depended on the uncorroborated credibility of the complainant.   The Master therefore recommended that the bill be dismissed.

Exceptions to the report of the Master were filed by the complainant, referring substantially to the exclusion of the testimony above mentioned : in his reporting that no confidential relation existed between the parties; that the mental status of

complainant had no material bearing on the case ; that there was no fraud or surprise ; that the facts were not established within the two-witness rule, and that there were no corroborating circumstances ; and lastly, in recommending that the bill be dismissed.

The court after argument, entered a decree reversing the conclusions of the Master and ordering that the said deed be cancelled and set aside, but denying the prayer for an account. WOODWARD, J., filed the following opinion :—

The reason and researches of the Master seem to us to have been too severely restricted to the question of the insufficiency of consideration, and of surprise. There can be little doubt that the decisions of our own courts sustain his findings on these subjects, so far as the establishment of a general rule is concerned. But there is another department of the equity jurisdiction which would seem to be applicable to a case like the present one, and which has received no attention from the Master. We refer to the equitable remedy in cases of mistake. A mistake exists when a person under some erroneous conviction of law or fact, does or omits to do some act which, but for the erroneous conviction, he would not have done or omitted. It may arise either from unconsciousness, ignorance, forgetfulness imposition or misplaced confidence. Where the mistake arises from imposition or misplaced confidence, relief may be had on the ground of fraud. Where it arises from unconsciousness, ignorance or forgetfulness, redress may be obtained in some cases, and solely on the distinct equitable basis of mistake. (See Bispham's Principles of Equity, 2d edition, p. 240 ; Haynes Outlines of Equity 132 ; Kerr on Fraud and Mistake 396 ; Story's Equity, sec. 110.)

The general rule pervading all systems of jurisprudence is doubtless that embodied in the maxim, "ignorantia legis neminem excusat." But this maxim is not of universal application in equity. The rule is now stated to be, that a mistake as to the general law is irremediable in equity, but that a mistake as to individual rights may, under certain circumstances, be reversed. See Bispham on Equity, p. 241. There is a class of cases referred to by Judge Story, in his Equity Jurisprudence, vol. I., § 120, 130, which "seem to involve, in some measure, a mistake of fact arising from a mistake of law." These cases are recognized as exceptions to the general rule expressed by the maxim of the common law, not only by the text writers, but also by numerous decisions in our own supreme court. We refer to Heacock v. Fly, 2 Harris 540 ; Gross et al. v. Leber, 11 Wr. 526 ; Peters v. Florence, 2 Wr. 194. It has also been held, that where ignorance of the law exists on one side, and that ignorance is known and taken advantage of by the other party, the

former will be relieved. See Bispham, Equity, p. 242; Whelen's Appeal, 20 P. F. S. 427.

The general rule is, that a mistake will not be relieved against, if it be the result of a party's own negligence; but even here, the rule is so qualified that reasonable diligence is all that is required, and a party will not be deprived of his right to equitable relief, simply because he has not exercised the highest possible degree of care; and even negligence may not in all cases close the door of chancery against a complainant, if the position of the other party has not been changed in consequence thereof: Bispham 247; Mayer *v.* The Mayor, 63 N. Y. 455.

There is a case referred to in Bispham, in his work on the Principles of Equity, page 242, which would seem to be an important authority on the question we are now considering. It is that of Lansdown *v.* Lansdown, Mosley 364, and it was there held, that where the eldest of three brothers divided lands, of which a second brother had died seised, with the youngest, under the mistaken impression, confirmed by a friend of both parties who had been consulted, that land could not ascend, and that he was not therefore his brother's heir—that he was entitled to equitable relief.

In the case now before us there would seem every reason to believe that Frederick M. Nulton acted throughout in entire ignorance of his rights, while those who dealt with him on behalf of Mrs. Nulton, as well as Mrs. Nulton herself, were fully informed of the truth of the case in all its bearings. We are unable to so read the evidence as to come to any other conclusion. He was, from first to last, the victim of ignorance, credulity and misplaced confidence on his own part; and of the craft, falsehood, and fraud of Mrs. Nulton and her friends, on the other part. He was made to believe that both the widow and George Paddock had interests in the estate, which they did not have, and that the transaction which resulted in robbing him of more than one-half of his inheritance, was, in point of fact, a generous favor to himself. Every form of duplicity which the circumstances permitted, seems to have been employed against him. He was to have a conveyance to himself from the widow, of one-half the land, and was also to share equally in the division of the personal estate, the widow agreeing not to claim her $300. In point of fact, so far as the evidence shows, he got from her a conveyance of a little more than one-third of the land, and that the least valuable portion of the farm. Of the personal property it would seem that he never got anything. Mr. Turner, who seems to have figured as the friend and counsellor of the widow, and who the Master finds " had been retained by her as an adviser," and George Paddock, called at the house of Benjamin Nulton, after his death, but before the

[Nulton's Appeal.]

funeral, entered a bed-room, and took from a box a sum of money, which they carried away. The widow herself promptly claimed her $300 out of the estate of her deceased husband, and has received the money. It does not appear that Frederick M. Nulton has received any portion of the personal estate whatever, although, as we have said, he was to share equally with the widow in its division.

We cannot agree with the Master that the fraud alleged in this case, depends mainly on " the uncorroborated credibility of one witness, and he the plaintiff." The corroborations of the plaintiff are to be looked for, not in the direct testimony of living witnesses, but in the circumstantial proof afforded by the whole case; and these corroborations, to our mind, seem to abound in every portion of it, and to point to one conclusion, and that is the one which results in compelling us to decide the case in favor of the plaintiff, and against the defendant.

The following decree was entered :

" The conclusions of the Master are reversed ; and it is further ordered and directed that the deed of Frederick M. Nulton and wife, to Elvira Nulton, dated 2nd April 1881, and recorded in the office of the Recorder of Deeds, &c. for Luzerne county, in Deed book No. 223, page 19, &c. be and the same is hereby cancelled and set aside, and declared to be null, void and of no effect. The prayer of the bill for an account is denied without prejudice to the plaintiff."

The defendant thereupon took this writ of error, assigning for error the said decree of the court.

*G. R. Bedford* (*T. H. Atherton* with him), for the appellant.

*Q. A. Gates*, for the appellee.

Mr. Justice CLARK delivered the opinion of the court, May 7th 1883.

The prayer of this bill is for the rescission and cancellation of a deed of conveyance, from Frederick M. Nulton to Elvira Nulton, dated April 2d 1881 for eighty-nine acres and twenty-one perches of land, situate in Franklin township, Luzerne county, which was regularly executed and delivered ; also for an account.

The Master, after full consideration, recommended a decree dismissing the bill ; the learned court below, however, upon examination of the report, reversed the Master, and ordered the said deed to be cancelled and annulled, denying, however, the prayer for an account.

We will not enter into any minute discussion of the facts in

dispute ; they have already been considered fully by the Master on the one hand, and by the court on the other.   It is only necessary that we should indicate which view of the case the judgment of this court shall approve, with a general statement of the reasons therefor.   A brief reference, however, to the respective parties, showing their relation to each other, as well as to other persons involved in the controversy, will lead to a better understanding of the case.

Benjamin Nulton, at his decease, was the owner of a considerable estate, consisting, in part, of a tract of land containing one hundred and fifty-five acres, more or less, upon which he resided, and of which the lands described in the aforesaid deed are part.   He left surviving him a widow, the said Elvira, aged fifty years, and an adopted son, the said Frederick M. Nulton, aged thirty-two years ; the latter had a wife and four children, and for nine years prior to the decease of Benjamin Nulton, had not lived with his adopted father.   The old man's family consisted of himself, his wife, and a young man named George Paddock, then about nineteen years of age, whom he had taken from the poor-house when a child.   George was not legally adopted, as Frederick had been, but had lived in the family and labored on the farm for fifteen or sixteen years.   In the year 1881, George left the old man's home, but was invited, by letter from the old man, to return ; in the letter the writer says " if you will come and stay with me as long as I live, I will give you all I hold," &c.; George returned pursuant to the invitation, and remained.   Benjamin Nulton died suddenly, on the 26th day of March 1881, intestate, and without having made any provision for George, as he had agreed.   Elvira employed one J. C. Turner, to assist her in this new complication of her affairs, and on Monday, after the funeral, the parties met at Wilkesbarre, each to ascertain the nature and extent of their respective rights.   At this meeting, which was on the 29th March 1881, an agreement was entered into between Frederick M. Nulton and Elvira Nulton for a division of the farm between them ; a survey to be made and mutual releases to be executed within ten days or sooner if a proper survey could be made.   Subsequently a survey was made and on the 2d day of April 1881, mutual conveyances were interchangeably executed and delivered.

The prayer of the bill is that the deed from Frederick M. Nulton to Elvira Nulton, made under these circumstances, shall be delivered up for cancellation.   The ground upon which such relief is sought, as we find from an abstract of the bill furnished us is as follows, viz :

" That at the time of executing said deed the plaintiff was ignorant of his legal rights in the estate of Benjamin Nulton,

deceased, that the said deed was without consideration, made upon false statements of the said Elvira Nulton of the law and facts concerning the value of said estate and is fraudulent and void."

The answer filed by the defendant, being responsive to the bill, expressly negatives all the material allegations contained therein, and avers that the plaintiff was fully acquainted with his legal rights; that the survey of the farm was made and the deed drawn under his direction: that the money consideration of one dollar therein named was paid; that no false statements either of law or facts were made to induce the plaintiff to execute his deed, and that in pursuance of her deed to the said plaintiff for the remaining portion of the farm he went into possession of his portion and remains still in the possession thereof.

Upon a careful review of all the facts and circumstances, in proof, we are unable to agree with the learned court, and, therefore, accept the conclusions of the Master: We fail to find such evidence of fraud or mistake as would justify a decree for cancellation of an executed conveyance. The undoubted effect of the answer filed was to require the plaintiff by sufficient proof to establish the facts traversed. The testimony of the plaintiff, unsupported and alone, is insufficient for that purpose, the answer was responsive to the bill, and therefore another witness, or proof of circumstances in corroboration, were required. The plaintiff must bring his case within the well-established rule of equity that where the defendant, in express terms, negatives the allegations of the bill, and the evidence of one person only affirms what has been so negatived, then the court will neither make a decree nor send it to a trial at law: Daniel's Ch. Pr. & Pl. 983. Nor would the cause be sent to a trial at law, unaccompanied by instructions as to the requisite amount of proof to sustain a verdict contrary to the positive denial of the answer. The operation of the defendant's answer is the same, although the equity of the plaintiff's bill is grounded on the allegation of fraud: Audenreid's Appeal, 8 Norris 120, and cases there cited; Horton's Appeal, 13 Penn. St. 67; Slemmer's Appeal, 58 Ibid. 155; Greenlee v. Greenlee, 22 Ibid. 225.

The plaintiff has produced no such witness, nor has he shown such facts in corroboration as would overcome the effect of the answer. It is said in the opinion of the court below, that " the corroborations of the plaintiff are to be looked for, not in the direct testimony of living witnesses, but in the circumstantial proof afforded by the whole case, and these corroborations seem to abound in every portion of it, and to point to one conclusion," &c. If the fact in dispute were whether or not Frederick M. Nulton made an unwise or improvident contract

[Nulton's Appeal.]

with Elvira Nulton, then the corroborations would seem to abound in every part of the case; but as touching the real questions at issue, we fail to find a single important fact or circumstance outside of the testimony of Frederick M. Nulton, which can be regarded as a substantial corroboration.

Assuming that he was not actuated in this transaction by motives of generosity, affection or sympathy, he made a bad bargain; several witnesses testify to that, whilst as many say that he was an ignorant man, of very moderate mental capacity and lacked business experience. The Farrels testify that Turner and Paddock, prior to the funeral, were handling and counting the old man's money. Their conduct was, however, not concealed from Frederick, or from any one, and it is not improbable under the circumstances that they may have been at the time in search of a will; at all events, this transaction had no relevance to the matter now under discussion. There was no confidential relation existing between Frederick and Elvira. He had not for some years been a member of the household of Benjamin Nulton; he was not of kin to the widow, he had not been adopted by her, they dealt at arm's length. The facts referred to, although suitable for consideration in a proper case, are not corroboratory in their character.

But if the testimony of Frederick M. Nulton were supported in all essential particulars, the conscience of the court would not be moved to order this deed to be delivered up for cancellation. His testimony, taken together, does not show the perpetration of a fraud upon him, nor that he was mistaken in, or ignorant of his rights. On the contrary, Turner, at the first interview, told him frankly that he had been adopted, and afterwards he was assured of that fact in the presence of the Messrs. Shoemaker. It was upon the assumption of that fact that all the negotiations were conducted. He seemed to know the effect of a legal adoption, for he was eager to ascertain the fact, and in his search went where only it could be reliably known. He knew he had a right to the land under his adoption, as he could have no right otherwise. Turner, it is true, told him of the letter written to Paddock, and that the old man had promised to make Paddock equal with Frederick, but the letter was produced and more than realized Turner's statement, as the old man in that letter promised Paddock all that he held, instead of half. The letter constituted the ground for a bona fide claim, not for the land perhaps, but for compensation, and whilst we cannot now say what Paddock might "hold" under his claim, it does not appear that by enforcing his claim that he would not "hold as much" as Frederick. It was a doubtful claim; it was the subject of suit and, therefore, of compromise. The survey was made under Frederick's own eye, ac-

[Peck v. Whitaker.]

cording to landmarks previously agreed upon, and, although he objected, yet he afterwards agreed, renewed his objections, and again agreed; and finally, after two or three days deliberation, he, with apparent willingness, executed the deeds. He of course knew the division was not equal, that was the ground of his objection. Although he says he was ignorant of his rights, he does not say in what respect he was ignorant of them.

It will also be observed that this bill was filed without any offer on the part of the complainant to place the widow in statu quo, or to reconvey to her the dower interest in that part of the tract conveyed by her under this arrangement. This was certainly, pre-requisite, at least upon the issue raised by the complainant's allegations of want of consideration, mistake and ignorance of legal right. On the contrary, Frederick went into possession of his portion of the tract under his deed, has had exclusive enjoyment thereof to the lines of the survey, without any recognition of her dower rights or any offer to restore them.

We conclude, therefore, that although there may have been some powers of persuasion, exercised by the widow, in her own interest, there was, in fact, no fraud established; that the deeds were undoubtedly made upon a good consideration; that Frederick was not ignorant of his rights, and that there was no mistake or surprise on his part in this matter, and that, therefore, the deeds are binding upon the parties.

The decree of the court below is therefore reversed, and the bill is dismissed at the cost of the appellee, who is the complainant therein.